Filed 11/7/25  P. v. Garcia CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RICHARD GARCIA,<br><br>    Defendant and Appellant. | F086737<br><br>(Super. Ct. No. F20906116)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  F. Brian Alvarez, Judge.

Heather Monasky, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary, Ian Whitney, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted defendant Richard Garcia of assault upon a peace officer, driving the wrong way while evading an officer, evading an officer with willful or wanton disregard, driving with a blood-alcohol content of 0.08 or higher, and driving while under the influence of alcohol. Garcia was sentenced to 180 days in jail. The trial court granted probation for three years.

Garcia appeals, arguing his convictions must be reversed on the following grounds: (1) The prosecutor violated the Racial Justice Act of 2020 (RJA; Pen. Code,[1] § 745) by using racially discriminatory language during trial; (2) Testimony of a police officer constituted error in violation of *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*); (3) The court erroneously admitted lay opinion identification testimony in violation of Garcia's due process rights; and (4) The combined effect of the individual errors resulted in prejudice. Garcia further argues that if the first three errors are forfeited for failure to make a timely objection on each ground stated, his counsel was ineffective.

For the reasons explained below, we reject Garcia's contentions and affirm.

## PROCEDURAL BACKGROUND

On October 22, 2021, the District Attorney of Fresno County filed an information charging Garcia with assault upon a peace officer with a deadly weapon or instrument (§ 245, subd. (c); count 1), driving the wrong way while evading a peace officer (Veh. Code, § 2800.4; count 2), evading an officer with willful or wanton disregard (Veh. Code, § 2800.2, subd. (a); count 3), misdemeanor driving with a blood-alcohol content of 0.08 or higher (Veh. Code, § 23152; subd. (b); count 4), and misdemeanor driving under the influence of alcohol (Veh. Code, § 23152, subd. (a); count 5).

On July 6, 2023, a jury found Garcia guilty as charged.

On August 11, 2023, the trial court sentenced Garcia to 180 days in jail and granted probation for three years.

---

[1] Undesignated statutory references are to the Penal Code.

# FACTUAL BACKGROUND

On the night of July 17, 2020, Patrol Officer Anthony Yanni watched a vehicle with expired registration fail to stop at a stop sign. Yanni was behind the vehicle, heading westbound, when he initiated a traffic stop by activating both his lights and siren. However, the vehicle proceeded to go into oncoming traffic and ran a stop light heading southbound. Yanni advised dispatch that the vehicle failed to yield and continued pursuit.

The vehicle traveled southbound before turning onto a country road. Yanni paced the vehicle and estimated it was traveling about 110 miles per hour. After running through a stop sign and a stop light, the vehicle's brakes were suddenly slammed on just before another stop sign, and it came to a stop. Yanni also came to a stop about five feet behind the vehicle. There were at least three people inside. Yanni was positioned directly behind the driver's side of the vehicle and observed through the driver's side rear view mirror an individual with dreadlocks wearing a black hat and a white shirt. Yanni thought this individual might be the driver.

Yanni stood behind the door of his vehicle, drew his gun, and gave the individuals in the vehicle commands to stick their hands out of the windows. However, the driver reversed and struck the front end of Yanni's patrol vehicle; the door struck Yanni's front torso area. He was not injured.

After the collision, the driver accelerated forward and ran another stop sign. Yanni got back into his patrol vehicle and continued pursuit; he also called for assistance. The vehicle made several turns and ran another stop sign. Yanni estimated the vehicle was traveling around 105 miles per hour. Yanni eventually lost sight of the vehicle when it returned to the city. Yanni then began communicating with the air support unit.

Sheriff's Deputy Michael Gong was working as a tactical flight observer in a helicopter on the night of July 17, 2020. He received a call at approximately 8:17 p.m., informing him that the police department was in pursuit of a fleeing vehicle. The sky

was clear, and Gong had good visibility. He located the vehicle from about 500 feet off the ground. The vehicle was driving very fast and was making rapid turns and movements. Gong followed it. Then, the vehicle abruptly stopped mid-block, and an individual wearing a red shirt exited the passenger side. After the individual exited the vehicle, the vehicle began moving.

The vehicle abruptly pulled over again, and three more individuals exited. One individual exited the driver's side, and two others exited the passenger side at about the same time. The individuals exited the vehicle rapidly, not leaving any time to switch seats or "cross over" from the driver's side to the passenger side.

One of the individuals that exited the passenger side was wearing a black shirt. The driver was a male wearing a white shirt, light-colored shoes,[2] and a red hat. Only the driver was wearing a white shirt. The passengers went to the east side of the street; the driver remained on the west side of the street. Gong watched as the driver and passengers were detained by officers about 400 feet from the vehicle.

Garcia was detained on the west side of the street; passengers Tyrrell Stroud and Eric Garcia were detained on the east side of the street.

Air support directed another police officer to the first passenger that exited the vehicle. Police Officer Christian Cano identified the individual as Jay Curtis because Curtis matched the description from air support and Cano was "familiar with him from prior contacts." Curtis wore a red shirt. Initially, Curtis was uncooperative, but Cano "was able to talk him down." Curtis's "family also arrived on scene[,] and they were uncooperative as well."

---

[2]    At the preliminary hearing, Gong testified that the driver was a heavy-set Hispanic male wearing a white shirt, red hat, and red shoes.

Garcia wore a white shirt, jeans, a dark hat, and white shoes. Eric Garcia wore a black shirt. Stroud wore a dark shirt and had dreadlocks. Curtis wore a red shirt and had braids.

The four individuals declined to speak to Yanni after being provided the *Miranda*[3] advisement. Garica appeared to be intoxicated. Yanni observed slurred speech, the smell of alcohol, and bloodshot, watery eyes. Yanni attempted to conduct a DUI investigation. However, Garcia was unwilling to perform any field sobriety tests or answer any standardized questions.

Garcia agreed to provide two breath samples. Samples taken at 10:11 p.m. and 10:14 p.m. measured 0.15 and 0.16, which is double the legal limit. A senior criminalist opined that "all individuals with an alcohol concentration 0.07 percent are too impaired to operate a motor vehicle safely."

An inventory search of the vehicle was performed. The passenger seat was moved "completely forward" as if an individual in the back exited the passenger side. The driver's seat looked like it was never moved and in the "normal" upright position.

## DISCUSSION

### I. The RJA

Garcia argues, for the first time on appeal, that the prosecutor exhibited racial bias and pursued an "us versus them" narrative, pointing to various statements and testimony elicited by the prosecutor and certain photographs admitted into evidence. (See § 745, subd. (a)(1).) He contends the photographs of Curtis's tattoos, references to Curtis being from "the streets," law enforcement's recognition of Curtis from "prior contacts," and Garcia's failure to cooperate with law enforcement violated the RJA. He further contends, if the issue is forfeited, his counsel was ineffective for failing to object on these grounds. (See § 745, subd. (c)).

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

5.

The People respond Garcia forfeited his RJA claim. Reaching the merits, the People assert Garcia's claim fails because none of the challenged evidence constituted racially discriminatory language or otherwise showed bias or animus towards Garica because of his race.

We conclude Garcia forfeited his RJA claim and failed to establish ineffective assistance of counsel.

### A. Additional background.

#### 1. Motion In Limine

Garcia's counsel moved in limine to exclude any allegations regarding Garcia's gang membership. At the hearing on in limine motions, Garcia's counsel argued that there should be no reference to any gang affiliation on behalf of Garcia or the other passengers in the vehicle. Counsel also stated, "I am aware that the photos might indicate that there is some gang affiliation. There's no objection to the photos as long as there's no reference to any gang affiliation."

The prosecutor acceded to not mention any gang affiliation. He also agreed with Garcia's counsel on the "photograph issue."

The court granted Garcia's counsel's motion and ordered no reference to gang involvement.

#### 2. Prosecutor's Opening Statement

The prosecutor described the facts of the case and summarized pertinent testimony during his opening statement. He maintained that no statements were collected from any of the individuals who were arrested because they all "refused to provide statements after given the *Miranda* advisement." (Italics added.)

#### 3. Trial Testimony

The prosecutor asked if Yanni was familiar with either Garcia or Cutris prior to the incident. Yanni testified that he may have run into Curtis before "in the streets," but he was not familiar with either Garcia or Curtis.

6.

Yanni explained he did not conduct field sobriety tests because Garcia "didn't want to speak with" law enforcement after being advised of his *Miranda* rights.

Cano testified that he detained Curtis because Curtis "matched the description" from air support and because Cano "knew [Curtis] from prior contacts." Cano explained that when he first contacted Curtis, Curtis "was uncooperative." Curtis's family was also uncooperative.

The prosecutor showed Cano photographs of Curtis, which Cano confirmed was the correct individual. The photographs showed Curtis wearing a red shirt and black shorts and depicted tattoos on his neck and arms.[4] The final photograph did not show Curtis's red shirt but displayed his face.

4. Prosecutor's Closing Argument

The prosecutor discussed the identity of the individuals in the vehicle.[5] He noted that while there are no photographs showing both Curtis's face and shirt, the photographs depicted Curtis because "the tattoo patterns line up." The photographs were consistent with the testimony of Yanni, Cano, and Gong, who identified Curtis as the only individual in the vehicle wearing a red shirt. The prosecutor described a photograph of Garcia and stated that Garcia was the "only person in [the] vehicle that was wearing a white shirt."

### B. Overview of the RJA.

Effective January 1, 2021, the RJA prohibits state criminal convictions or sentences "on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) The purpose of the RJA is "to eliminate racial bias from California's criminal justice system

---

[4] The photographs that showed Curtis's red shirt did not show his face.

[5] The identity of the individuals in the vehicle was a central point of the trial; Garcia disputed he was the driver.

because racism in any form or amount, at any stage of a criminal trial, is intolerable [and] inimical to a fair criminal justice system." (Stats. 2020, ch. 317, § 2, subd. (i).)

"A violation is established if the defendant proves, by a preponderance of the evidence," that individuals involved in the case, including a judge, attorney, law enforcement officer, expert witness, or juror, "exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." (§ 745, subd. (a)(1).) The statute defines the phrase " '[r]acially discriminatory language' " as "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin. Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory." (§ 745, subd. (h)(4).) Once the defendant has learned a violation under the RJA occurred, a motion should be made "as soon as practicable." (§ 745, subd. (c).) "After a judgment has been entered, if the court finds that a conviction was sought or obtained in violation of subdivision (a), the court shall vacate the conviction and sentence, find that it is legally invalid, and order new proceedings consistent with [section 745,] subdivision (a)." (§ 745, subd. (e)(2)(A).)

Effective January 1, 2024, a new provision to the RJA was added by the Legislature through Assembly Bill No. 1118 (2023–2024 Reg. Sess.) (Assembly Bill 1118), permitting a claim to be raised on direct appeal alleging a violation of section 745, subdivision (a) and authorizing a defendant to move to stay the appeal and request remand to the superior court to file a motion. (§ 745, subd. (b), as amended by Stats. 2023, ch. 464, § 1.) However, "[t]he statute does not state that a defendant may raise a section 745 claim on direct appeal *for the first time* and does not refer to the general appellate rules governing the preservation or forfeiture of claims presented on

8.

direct appeal." (*People v. Lashon* (2024) 98 Cal.App.5th 804, 810 (*Lashon*); see also § 745.)

### C. *Garcia forfeited his claim.*

Garcia argues his RJA claim may be raised for the first time on appeal because the plain language of the statute authorizes review. (See, e.g., § 745, subd. (b).) He also claims the forfeiture rule is inapplicable when a defendant raises a constitutional challenge on appeal where it is uncertain whether the forfeiture rule applies. (See *People v. Peck* (1996) 52 Cal.App.4th 351, 362, fn. 5.) In the alternative, Garcia argues he received ineffective assistance of counsel.

For the first time in his reply, Garcia asks that we reach his claim on the merits, even if the issue is forfeited, because it presents a pure question of law, involves public interest, and affects the administration of justice.[6]

This case fails to present circumstances warranting an exception from general forfeiture rules. Section 745, subdivision (b) was amended by Assembly Bill 1118 to permit a defendant to "raise a claim alleging a violation of subdivision (a) on direct appeal from the conviction or sentence." However, two recent decisions held the general forfeiture rules apply to section 745 claims raised on direct appeal despite Assembly Bill 1118. (See *People v. Singh* (2024) 103 Cal.App.5th 76, 113 (*Singh*); *Lashon, supra*, 98 Cal.App.5th at p. 812 ["a section 745 claim, like any other appellate claim, is subject to the general appellate rules of preservation and forfeiture of claims that could have been but were not made in the trial court"].)

The court in *Lashon* considered the legislative history of the RJA and noted, "[T]he Legislature did not intend to allow a defendant to pursue such a claim for the first time on direct appeal where it could have been but was not raised in the trial court."

---

[6]    We need not address Garcia's claims raised only in his reply. (*Ford v. Pacific Gas & Electric Co.* (1997) 60 Cal.App.4th 696, 705.)

9.

(*Lashon, supra*, 98 Cal.App.5th at p. 813; see also *Singh, supra*, 103 Cal.App.5th at p. 113 [the defendant forfeited his RJA claim for failure to raise it first in the trial court despite Assembly Bill 1118's amendment to section 745].)

We agree and apply these authorities to the instant case. Garcia's RJA claim is forfeited because he failed to object or file a motion in the trial court.[7]

Garcia's claims also do not concern constitutional challenges that present a pure question of law. Every issue he raises requires reference to and consideration of the circumstances of the case and the record. (See, e.g., *People v. Potts* (2019) 6 Cal.5th 1012, 1035–1036.)

However, because Garcia contends his counsel was ineffective, we exercise our discretion to reach the merits of his contentions. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [an appellate court has authority to reach a forfeited claim].)

### D. *Garcia's counsel did not provide ineffective assistance for failing to object to the alleged RJA violations.*

To prevail on an ineffective assistance of counsel claim, prejudice must be affirmatively proved; the record must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 668, 694; accord, *People v. Ledesma* (2006) 39 Cal.4th 641, 745–746.) Tactical errors are generally not deemed reversible, and counsel's decisions are evaluated in the context of the record. (*Strickland*, at pp. 689–690.)

The reviewing court must determine whether the record contains an explanation for the challenged conduct. (*People v. Pope* (1979) 23 Cal.3d 412, 425 (*Pope*),

---

[7]    We also note the trial was held more than two years after the RJA became effective. The trial began on July 5, 2023, and the jury rendered a guilty verdict on July 6, 2023.

overruling recognized on another ground in *People v. Delgado* (2017) 2 Cal.5th 544, 559.) If the record sheds light on why counsel acted or failed to act in the manner challenged, the conviction will be affirmed if counsel's acts or omissions resulted from an informed tactical choice within the range of reasonable competence. (See *People v. Fain* (1969) 70 Cal.2d 588, 600.) In contrast, "where the record shows that counsel has failed to research the law or investigate the facts in the manner of a diligent and conscientious advocate, the conviction should be reversed since the defendant has been deprived of adequate assistance of counsel." (*Pope*, at pp. 425–426.)

However, in some cases, the record on appeal is silent regarding why counsel acted or failed to act in the manner challenged. These cases are affirmed on appeal "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." (*Pope, supra*, 23 Cal.3d at p. 426.) An assertion counsel was ineffective on a silent record is more appropriately made in a petition for habeas corpus, which promotes judicial economy.[8] (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.)

With these principles in mind, we consider whether Garcia received ineffective assistance for his counsel's failure to object to various RJA violations. The record is silent as to why defense counsel failed to object or file a motion based on a violation of the RJA. However, Garcia's counsel could have reasonably believed there was no violation of section 745, subdivision (a). It was reasonable for Garcia's counsel to conclude that an objection or motion on this basis would not have been meritorious, particularly because the alleged comments neither concerned Garcia nor implicated his race, either directly or indirectly. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 463 ["Representation does not become deficient for failing to make meritless objections."].)

---

[8]  A habeas corpus proceeding provides an evidentiary hearing and allows trial counsel the opportunity to set forth his or her reasons for acting or failing to act in the manner challenged. (§§ 1483, 1484; *Pope, supra*, 23 Cal.3d at p. 426.)

None of the issues Garcia raises constitute "racially discriminatory language about the defendant's race" or refer to "the defendant's physical appearance, culture, ethnicity, or national origin." (§ 745, subds. (a)(2), (h)(4); see *People v. Stubblefield* (2024) 107 Cal.App.5th 896, 922 ["the prepositional phrase 'about the defendant's race' in [section 745,] subdivision (a)(2) implies a certain degree of focus, requiring more than just a passing reference"].) Garcia fails to show how the photographs and statements he now complains of meet the definition of "racially discriminatory language" for purposes of section 745. Counsel was not remiss when he failed to object.

### 1. Curtis's Tattoos

Moreover, there is no prejudice on this record. (See *Strickland v. Washington, supra*, 466 U.S. at p. 694.) Garcia first argues the RJA was violated when the prosecutor showed the photographs of Curtis's tattoos. But the photographs do not depict Garcia. Therefore, the prosecutor's reference to Curtis's tattoos does not show he harbored racial bias towards Garcia. (See § 745, subd. (a)(1) [the RJA is violated if an attorney in the case "exhibit[s] bias or animus towards *the defendant* because of *the defendant's* race, ethnicity, or national origin" (italics added)].)

Garcia's counsel and the prosecutor agreed to the admission of photographs. The prosecutor did not describe Curtis's tattoos. The comment that the tattoos depict the same person was brief and not racially driven. The photographs of Curtis were relevant to prove his identity.

### 2. Testimony That Curtis Was From "the streets" and Known From "prior contacts"

Garcia next argues that references to law enforcement knowing Curtis from "the streets" and "prior contacts" from violated the RJA. However, the testimony only described Curtis; it did not implicate Garcia. There was no reference to either Garcia or Curtis's race, nor any mention of Garcia himself being from "the streets" or known from

"prior contacts."[9]  This argument fails per the plain language of section 745, subdivision (a)(1).

When reading this in context, moreover, the testimony also referred to Curtis's identity and supported the prosecution's theory that Garcia was the driver of the vehicle.[10]  There were no racial implications.

In *People v. Howard* (2024) 104 Cal.App.5th 625, the defendant established prima facie showing of a violation of the RJA when the prosecutor cross-examined the defendant about where he grew up and his "connection" with a particular area, asserted in his RJA motion that the particular area was " 'historically predominately African American,' " and provided documents which showed the general historical reputation of the location.  (*Id*. at pp. 653–655, 645.)  The Sixth District Court of Appeal held that given the location's "historical reputation and demographics, and the recognized connection between a person's place of residence, racial group, and negative stereotypes, …[the defendant] 'produce[d] facts that, if true, establish that there is … more than a mere possibility' (§ 745, subd. (h)(2)) that the prosecutor 'used racially discriminatory language … or otherwise exhibited [racial] bias … towards [the defendant]' (§ 745[, subd. ](a)(2)) by asking him about his connections to [the location] where that fact had not been the subject of testimony by any prior witness."  (*Id*. at p. 655, second & third bracketed insertions in original.)

We note two significant differences in our case.  Initially, there were no questions or testimony regarding Garcia's place of residence.  Law enforcement only recognized Curtis "from the streets" and from "prior contacts."

---

[9]  Although Yanni may have run into Curtis before "in the streets," Yanni was not familiar with Curtis or Garcia.

[10]  Because Cano was familiar with Curtis, he did not mistake Curtis for Garcia.

There was also no evidence showing that the term "from the streets" or "prior contacts" is comprised of a specific race. Thus, law enforcement's recognition of Curtis did not serve as a proxy for race. (Cf. *People v. Turner* (2001) 90 Cal.App.4th 413, 420 [prima facie showing was made of unconstitutional juror exclusion where great emphasis was placed on the juror's place of residence, although the prosecutor argued that his distrust of jurors from the juror's location of residence was based on past experience and this was not a race-related matter, there was a showing that the population of the location was substantially African-American].)

In arguing that the terms "from the streets" and "prior contacts" violate the RJA, Garcia cites to a variety of out-of-state cases holding that racial bias is promoted when there are suggestions made that the defendant is from a certain geographical area. (See, e.g., *Matter of Schiff* (1994) 83 N.Y.2d 689, 692–693 [613 N.Y.S.2d 117, 635 N.E.2d 286] [the judge's comment that "it was safe for young women to walk the streets 'before the blacks and Puerto Ricans moved here' " violated governing rules related to his duty to uphold the integrity and impartiality of the judiciary].) However, crucially missing is the nexus in this case demonstrating that "the streets" and "prior contacts" are comprised of a specific race and Garcia himself was from that area.[11]

### 3. Lack of Cooperation with Law Enforcement

Garcia maintains the testimony regarding the lack of cooperation on behalf of Garcia, the other individuals in the vehicle, and Curtis's family members was racially biased. We again fail to see the nexus which implicates—either expressly or implicitly—Garcia's race.

There is also no evidence showing Garcia invoked his right to counsel or failed to comply with the field sobriety tests because of his race. Instead, the testimony was elicited to explain the reason why field sobriety tests were not performed.

---

[11] We also point out that none of the cases Garcia cites applies the RJA.

14.

4. "Us Versus Them" Narrative

Finally, Garcia argues the prosecutor introduced impermissible character evidence when Garcia did not put his character at issue, by implying Garcia and his friends' refusal to speak to law enforcement was indicative of his bad character under Evidence Code section 1101.

All relevant evidence is admissible except as otherwise provided by statute. (Evid. Code, § 351.) " 'Relevant evidence' means evidence … having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Evidence of a defendant's conduct is generally inadmissible when offered to prove his or her conduct on a specified occasion. (Evid. Code, § 1101, subd. (a); *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405–406.)

Here, the fact that Garcia and the other defendants did not speak to law enforcement after being provided the *Miranda* advisement is not character evidence but was relevant to explain the events that occurred on the night of the incident. Garcia does not argue that the evidence was not relevant.

In support of his position, Garcia cites *People v. Cardenas* (1982) 31 Cal.3d 897, 904 and *People v. Maestas* (1993) 20 Cal.App.4th 1482, 1494, both which held that the trial court abused its discretion when it allowed the prosecution to introduce evidence that the defendant and his witnesses were affiliated with a gang.

These cases are inapposite. There was no suggestion that Garcia or the other individuals were affiliated with a gang.

Neither party urged the jury to convict Garcia on the basis of his race.[12] (Cf. *People v. Stubblefield, supra*, 107 Cal.App.5th at p. 924 [the prosecutor's closing

---

[12] We note the trial testimony does not mention Garcia's race. There were pictures showing Garcia's identity to the jury. We further note that Gong identified the driver of the vehicle as a

15.

argument that the defendant's race was a central factor in the explanation for the decision not to search the defendant's house for a firearm constituted "racially discriminatory language" in violation of RJA]; *People v. Simmons* (2023) 96 Cal.App.5th 323, 336 [the prosecutor's comment violated section 745, subdivision (a) because it equated the defendant's "skin tone and 'ethnic presentation' with deception, implying that [the defendant] was not a credible witness because the color of his skin fooled women and confused strangers"].)  This is not a situation in which we could decide, if Garcia's counsel made an objection or motion under the RJA, it would have been meritorious. (See *Singh, supra*, 103 Cal.App.5th at pp. 118–119.)  Garcia has not established the resulting prejudice required to prevail on a claim of ineffective assistance of counsel.

For these reasons, we also reject Garcia's due process challenge.  Because the record does not show a RJA violation occurred or any resulting prejudice, Garcia's trial was not fundamentally unfair such that it was a violation of his due process rights under the Fourteenth Amendment.

## II.    *Doyle* **Error**

Garcia argues the prosecutor committed a *Doyle* error because he revealed that Garcia declined to provide a statement to law enforcement after he was given his *Miranda* rights.  (See *Doyle, supra*, 426 U.S. at pp. 618–620.)  Garcia contends that if his claim is forfeited for failure to object, his counsel was ineffective on this basis.

The People maintain Garcia forfeited his claim for failure to object, and reaching the merits, there was no error.  We conclude Garcia is not entitled to relief.

---

"heavy-set Hispanic male" at the preliminary hearing.  There was no objection to this description and no further mention of Garcia's race on this record.

### A. *Additional background.*

During the prosecutor's opening statement, he explained that no statements were collected from Garcia and the other individuals after they were given the *Miranda* advisement.

At trial, Yanni described the events that occurred after Garcia was detained. Yanni placed Garcia in his patrol vehicle and transported him to the police department. Once at the police department, he attempted to interview all four individuals, including Garcia. Yanni stated that after being advised of their rights under *Miranda*, "[t]hey all declined to speak with [him]." Yanni explained that he attempted to conduct a "DUI investigation" after he noticed that Garcia appeared to be intoxicated. However, field sobriety tests can only be performed if the subject is compliant. Garcia was unwilling to perform the tests. Yanni did not attempt to ask any of the "standardized questions" related to the field sobriety tests because Garcia had already been given his *Miranda* rights and "declined to speak" with Yanni.

The parties agree, as do we, that no objection was proffered to the prosecutor's statement or any of the foregoing testimony.

### B. *Analysis.*

Garcia failed to object at trial on the ground he now advances and therefore has forfeited the contention for purposes of this appeal. (See *People v. Hughes* (2002) 27 Cal.4th 287, 332; *People v. Seumanu* (2015) 61 Cal.4th 1293, 1333 [objection required to preserve *Doyle* error for appellate review].) He acknowledges this omission but contends his trial counsel rendered ineffective assistance in this respect, and thus, we will reach the merits of his contention. (See *People v. Upsher* (2007) 155 Cal.App.4th 1311, 1325 [the reviewing court does not need to decide whether counsel's performance was deficient before considering the prejudice suffered by the defendant, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, … that course should be followed"].)

17.

## 1. Applicable Law

Under *Doyle*, a prosecutor is prohibited from using a defendant's silence following arrest and advisement of his *Miranda* rights to impeach his trial testimony. (*Doyle*, *supra*, 426 U.S. at pp. 617–618.) For an error under *Doyle* to occur, there must be two components: the prosecutor must use the defendant's silence against him *and* with permission by the trial court. (*People v. Clark* (2011) 52 Cal.4th 856, 958–959 (*Clark*) [the officer's testimony that the defendant failed to react when he was being accused of murder and attempted murder was an improper reference to the defendant's invocation of his right to remain silent].) The basis of the rule in *Doyle* is that " 'it is fundamentally unfair, and a deprivation of due process, to promise an arrested person that his silence will not be used against him, and then to breach that promise by using silence to impeach his trial testimony.' " (*Clark, supra*, 52 Cal.4th at p. 959.)

A *Doyle* error also occurs when a prosecutor uses the defendant's silence against him during direct examination of an interrogating officer before the defendant testifies. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 118 ["No less unfair is using that silence against a defendant by means of the prosecutor's examination of an interrogating detective even before the defendant has had the opportunity to take the stand."].)

## 2. No *Doyle* Error

Turning to the first prong of *Doyle*, whether the prosecutor used Garcia's silence against him, we see no error on this record. The rule under *Doyle* is not violated when " 'the evidence of [the] defendant's invocation of the right to counsel was received without objection and the remarks of the prosecutor did not invite the jury to draw any adverse inference from either the *fact* or the *timing* of [the] defendant's exercise of his constitutional right.' " (*People v. Huggins* (2006) 38 Cal.4th 175, 199.)

The prosecutor's opening statement was not aimed at Garcia's silence, but rather to explain what happened after Garcia was detained. Immediately after the prosecutor stated that Garcia and the other individuals did not provide a statement to law

18.

enforcement, the prosecutor remarked, "So, no statements were collected from any of the individuals." Garcia's silence was relevant to describe the facts of the case and the reason why law enforcement did not obtain statements.

Garcia asserts the prosecutor drew inferences that he was part of a "violent gang" who knew to invoke his right to remain silent. He further argues that his failure to speak to law enforcement "coincides with the deeply rooted stereotype of the young Black or Hispanic superpredator." We disagree. The mention was brief and was not highlighted or connected by Garcia's race or any gang-related activity.[13]

We also do not see a *Doyle* violation with respect to the direct examination of Yanni. In *People v. Thomas* (2012) 54 Cal.4th 908, 936, our Supreme Court held that there was no violation under *Doyle* where the police detective testified that he stopped questioning the defendant after he indicated that he wanted a lawyer because the prosecutor did not use the comment against the defendant by inviting the jury to draw any adverse inferences from the remark.

Similarly, here, was little risk the jurors would draw an impermissible inference because Yanni discussed Garcia's silence in the context of conducting a DUI investigation. Yanni explained he was not able to conduct the field sobriety tests or ask Garcia the standard questions typically asked during a DUI investigation because Garcia invoked his right to remain silent. Yanni's testimony did not use Garcia's silence as indicative of his guilt, rather, it explained to the jury why there was no evidence related to a DUI investigation before them. (Cf. *People v. Galloway* (1979) 100 Cal.App.3d 551, 558–560 [the prosecutor twice argued to the jury that the defendant's " 'sudden recollection' " of his location on the night of the robbery and postarrest silence was indicative of his guilt was misconduct in violation of *Doyle*].)

---

**13** Defense counsel's motion in limine to exclude any references to gang activity was granted, and thus, there was no mention of Garcia's gang activity in the trial proceedings.

Moreover, a "*Doyle* violation does not occur unless the prosecutor is *permitted* to use a defendant's postarrest silence against him at trial .…" (*Clark, supra*, 52 Cal.4th at p. 959.) Permission occurs when the court overrules a defense objection, "thus conveying to the jury the unmistakable impression that what the prosecution is doing is legitimate." (*People v. Evans* (1994) 25 Cal.App.4th 358, 368; see *Greer v. Miller* (1987) 483 U.S. 756, 762.) In this case, the prosecutor did not attempt and was not permitted by the court to use Garcia's silence against him.

Thus, in both instances, the second prong of *Doyle* fails. There was no *Doyle* violation on this record.

There was also no error with respect to the prosecutor's statement that the other individuals did not provide a statement to law enforcement. "Mere witnesses … have no constitutional right to remain silent." (*People v. Seumanu, supra*, 61 Cal.4th at p. 1334.) Accordingly, the prosecutor's statement and Yanni's testimony with respect to the silence of the other individuals also is meritless.

### 3. Even Assuming Error, It Was Harmless

However, even if there was a *Doyle* violation, any error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.)

Garcia's case did not hinge on his invocation of right to counsel, but whether he was the driver.[14] The defense argued Garcia was not the driver. However, Gong identified Garcia as the driver of the vehicle. An inventory search was completed after Garcia and the other occupants of the vehicle were detained. The arrangement of the passenger seat was "completely forward," which indicated that a passenger in the

---

[14] Garcia later concedes this point, arguing that "the only issue for the jury to decide [was] who drove the [vehicle]."

20.

backseat exited by way of the passenger side.  The driver's seat was still in an upright position.  This evidence further corroborated Gong's identification of Garcia.**15**

The evidence against Garcia was compelling such to an extent that the verdict could not have been affected by the prosecutor's comment or Yanni's testimony regarding Garcia's assertion of his right to counsel.  (See, e.g., *People v. Hughes, supra*, 27 Cal.4th at p. 333.)  Even assuming Garcia had preserved this claim for appeal and there was an error under *Doyle*, any error was harmless beyond a reasonable doubt.

Accordingly, this lack of prejudice defeats Garcia's claim that his counsel rendered ineffective assistance by failing to object.  (See *People v. Ledesma* (1987) 43 Cal.3d 171, 217–218.)

## III.    Lay Witness Opinion Testimony

Garcia argues Yanni offered an improper lay witness opinion.  He contends Yanni undercut his own personal observations by agreeing with Gong that Garcia was the driver of the vehicle.  Garcia argues that if the issue is forfeited for failure to object, his counsel was ineffective.

The People respond Garcia forfeited his claim, and on the merits, Yanni's testimony was not a lay witness opinion.  We agree with the People that there was no error.

### A.  Additional background.

Photographs taken of Garcia after he was detained show that he was wearing a white shirt, a black hat, and closely cropped hair.

At trial, Yanni testified that when he was positioned directly behind the vehicle, he observed the driver through the driver's side rear view mirror.  He stated the driver had "a black hat, a white shirt, … and dreadlocks."  Yanni believed that the person he

---

**15**    When the vehicle stopped, Gong saw two people exit the passenger side, and one person exit the driver's side.  It was reasonable for the jury to believe that there was not enough time for the driver to switch seats with someone else or exit by way of the passenger side.

observed through the rear view mirror was "potentially the driver" because "that's what [he] saw from the mirror." On cross-examination, after Yanni reread his report, he testified that the driver was wearing a black hat and a red shirt.

After Garcia and the other individuals were detained, Yanni attempted to determine the driver of the vehicle as part of his DUI investigation. He testified he was able to determine Garcia was the driver of the vehicle by speaking to Gong and information provided to him through the "Air Support Unit." There was no objection to this testimony.

The jury was instructed with CALCRIM No. 333, regarding the opinion testimony of lay witnesses: "A witness who was not testifying as an expert gave his or her opinion during the trial. You may, but are not required to accept that opinion as true or correct. You may give the opinion whatever weight you think appropriate. Consider the extent of the witness's opportunity to perceive the matters in which his or her opinion is based, the reasons the witness gave for any opinion and the facts or information on which the witness relied in forming that opinion. You must decide whether information on which the witness relied was true and accurate. You may disregard all or any part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

### B. Analysis.

Garcia concedes his counsel did not compel a timely objection to Yanni's testimony that he now complains of on appeal. Our Supreme Court has routinely held that a trial counsel's failure to object to an evidentiary error on the same ground asserted on appeal forfeits the issue. (See Evid. Code, § 353; *People v. Dykes* (2009) 46 Cal.4th 731, 756; *People v. Partida* (2005) 37 Cal.4th 428, 433–435.) "The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal." ' " (*Partida*, at p. 434.) Garcia forfeited his claim.

However, Garcia contends that, even if his evidentiary claim is forfeited, we should reach the issue on the theory that his counsel was ineffective for failure to object. As set forth above, Garcia must demonstrate "both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Cudjo* (1993) 6 Cal.4th 585, 623.) But since " ' "[t]he object of an ineffectiveness claim is not to grade counsel's performance" ' [citation], where ' "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, … that course should be followed." ' " (*People v. Gana* (2015) 236 Cal.App.4th 598, 612–613, second bracketed insertion added; accord, *In re Cox* (2003) 30 Cal.4th 974, 1020 [disposal of an ineffectiveness claim on the ground of lack of sufficient prejudice should be followed when it is easier to do so].) We conclude Garcia has not met his burden.

1. The Challenged Testimony Was Proper

"A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800.)" (*People v. Leon* (2015) 61 Cal.4th 569, 601.) For example, " 'where the concrete observations on which the opinion is based cannot otherwise be conveyed.' " (*People v. Hinton* (2006) 37 Cal.4th 839, 889.) The identity of an individual is a proper subject of nonexpert opinion. (*People v. Mixon* (1982) 129 Cal.App.3d 118, 127.) " ' "By contrast, when a lay witness offers an opinion that goes beyond the facts the witness personally observed, it is held inadmissible." ' " (*People v. Dalton* (2019) 7 Cal.5th 166, 231.)

Yanni offered his opinion and described the driver of the vehicle based on his own observations. This was proper. (See *People v. Dalton, supra*, 7 Cal.5th at p. 231; Cf. *People v. Rodriguez* (2014) 58 Cal.4th 587, 631 [a lay witness's testimony regarding

facts that the witness has not personally observed calls for speculation and conjecture by the witness and is prohibited by Evidence Code sections 702 and 800].)

Garcia argues Yanni's testimony was improper when he offered his opinion as to the driver's identification after he spoke to the "Air Support Unit." However, in the context of his entire testimony, we do not believe this was a lay witness opinion but described the circumstances under which he performed his DUI investigation.

Garcia cites *People v. Rouston* (2024) 99 Cal.App.5th 997, 1011, where the court held that the detective, who was gang expert, provided improper expert opinion on the defendant's guilt when he said that the defendant fired a weapon that wounded the victim. The Fourth District Court of Appeal concluded the expert's opinion "was 'too helpful' and supplanted the jury's role." (*Ibid.*)

In contrast, Yanni's testimony did not replace the jury's decision as to the identity of the driver. Yanni initially expressed his personal observations. Thereafter, when describing the DUI investigation, he testified that he talked to Gong and the "Air Support Unit" to identify the driver. This testimony did not undercut his initial observations, since it was separate from and in the context of the DUI investigation, not lay witness testimony.

Garcia argues that the prosecutor's closing argument furthered Yanni's improper opinion when he stated that Gong was the primary identification witness. However, if Gong was the primary identification witness, Yanni's opinion regarding his identification of the driver was secondary to that of Gong. The prosecutor drove home the theory that the jury should rely on Gong as the identifying witness, not Yanni.

2. Even Assuming Error, It Was Harmless

But, even if Yanni's testimony was improper lay witness opinion, there is no reasonable probability that the jury would have reached a different result because other evidence was introduced which indicated Garcia was the driver of the vehicle. (See *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Pearson* (2013) 56 Cal.4th 393,

24.

446 [applying *Watson*'s harmless error analysis to erroneous admission of expert testimony].) As set forth above, additional evidence on this point was provided by Gong, who identified Garcia as the driver, as well as an inventory search, which tended to show only the driver exited the driver's side of the vehicle.

The jury was also instructed with CALCRIM No. 333, which told them to consider the information the witness relied on in forming his or her opinion. Yanni told the jury that he determined Garcia was the driver of the vehicle after he talked to Gong and the "Air Support Unit." A reasonable jury would have understood Yanni's testimony given the jury instruction and Yanni's explanation of the surrounding circumstances. (See *People v. Chhoun* (2021) 11 Cal.5th 1, 30 [courts presume the jury follows instructions].) There is no reasonable probability of a different result even if Yanni's testimony had been omitted.

For the same reasons, Garcia's claim that his counsel was ineffective on this basis for failing to object to Yanni's opinion testimony similarly fails. (See *In re Hernandez* (2019) 33 Cal.App.5th 530, 546 [to establish ineffective assistance of counsel, the defendant must show prejudice, that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different].)

## IV. Cumulative Errors

Garcia argues that the cumulative errors in this case resulted in a fundamentally unfair trial. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646; see also *In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32 ["Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial."].) " 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' " (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) Reversal is

25.

required when the cumulative effect of errors deprives the defendant of a fair trial and due process of the law.  (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

Here, there are no prejudicial errors to cumulate.  We have found no error on this record, and, any error we assumed for the sake of argument was harmless, whether considered individually or collectively.  As such, Garcia cannot demonstrate the cumulative effect of any alleged errors resulted in prejudice.  (See *In re Reno* (2012) 55 Cal.4th 428, 483 ["claims previously rejected on their substantive merits—i.e., this court found no legal error—cannot logically be used to support a cumulative error claim because we have already found there was no error to cumulate"], superseded by statute on another ground in *In re Friend* (2021) 11 Cal.5th 720, 728.)

## DISPOSITION

The judgment is affirmed.

HILL, P. J.

WE CONCUR:

LEVY, J.

SNAUFFER, J.

26.